**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **LESLIE URLAUB and MARK PELLIGRINI, on behalf of themselves and all others similarly situated,** | ) ) ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. 21 C 4133** |
| | ) | |
| **CITGO PETROLEUM CORPORATION, et al.,** | ) ) | |
| | ) | |
| **Defendants.** | ) | |

**<u>MEMORANDUM OPINION AND ORDER</u>**

MATTHEW F. KENNELLY, District Judge:

Leslie Urlaub and Mark Pellegrini have brought this suit on behalf of a class of similarly situated persons against their former employer, two defined benefit plans sponsored by the employer, and the fiduciary of the plans. They allege that the defendants have violated several provisions of the Employee Retirement Income Security Act of 1974 (ERISA) by using out-of-date mortality assumptions to calculate their benefits under the plans. The defendants have moved to dismiss, contending, among other things, that the plaintiffs have not sufficiently alleged violations of ERISA and that the statute does not authorize their requested remedies on one of their claims. For the reasons discussed below, the Court denies the defendants' motion to dismiss.

**Background**

Urlaub and Pellegrini are former employees of CITGO Petroleum Corporation. CITGO sponsors two defined benefit plans. Urlaub is a participant in the CITGO

Petroleum Corporation Salaried Employees' Pension Plan; Pellegrini is a participant in the Retirement Plan of CITGO Petroleum Corporation and Participating Subsidiary Companies. The administrator and fiduciary of the plans is the Benefit Plans Committee (the Committee).

Under the terms of CITGO's plans, the normal retirement age is 65, but CITGO provides plan participants who retire before that age an early retirement subsidy to incentivize the departure of high-salary employees. Without the subsidy, a participant who retires early receives lower monthly pension payments to account for their increased number of post-retirement (and thus pension-receiving) years. The early retirement subsidy essentially offsets this reduction, providing participants with unreduced or not-as-reduced early retirement pension payments. Both Urlaub and Pellegrini retired early and began receiving benefits before turning 65.

When the plaintiffs retired from CITGO, they were given packets with pension options. They chose to receive their benefits in the form of a joint and survivor annuity (JSA), which means that each of them will receive a monthly pension for his life, plus a monthly pension for the life of a surviving spouse. A participant selecting a JSA receives a lower pension benefit during his own life to account for the fact that his surviving spouse will receive pension benefits after he dies. The amount of money the surviving spouse receives depends on the kind of JSA the participant selects. A standard JSA (what Urlaub chose) provides a spouse with a monthly pension equal to 50% of the amount that the participant received. In contrast, a 75% JSA (what Pellegrini chose) provides a spouse with a monthly pension equal to 75% of the amount that the participant received.

Under ERISA, "qualified" JSA pension options must be the "actuarial equivalent of a single annuity for the life of the participant." 29 U.S.C. § 1055(d)(1)(B). In other words, the total value of payments made over the expected life of the participant and his or her spouse as part of the JSA pension must be equal to the total value of payments that would have been made over the expected life of the participant had he or she selected a single-life annuity (SLA). For participants who began receiving benefits prior to January 1, 2018, the defendants used the following assumptions to convert their SLAs to qualified JSAs: (1) an eight percent annual investment return, compounded annually, and (2) mortality rates from the 1971 Group Annuity Mortality Table projected to 1975 (GAMT).

On August 3, 2021, the plaintiffs sued CITGO, the plans, and the Committee on behalf of a class of similarly situated persons, alleging that the use of the GAMT resulted in illegally reduced pension benefits. All of the plaintiffs' claims involve the same operative facts. Specifically, they contend that the JSA benefits were determined based on an outdated mortality table and that, as a result, the anticipated payout was less than it should have been had an appropriate mortality table been used. All of the plaintiff's claims are asserted under provisions of ERISA. The first three counts of the complaint allege that the defendants violated (1) the JSA requirement of section 1055; (2) the actuarial equivalence requirement of sections 1054 and 1055; and (3) the anti-forfeiture rules of section 1053. The fourth count of the complaint alleges breaches of fiduciary duty under section 1104.

The defendants moved to dismiss. On October 8, 2021, the Court orally denied the motion on the defendants' statute of limitations and failure to exhaust arguments but

3

ordered briefing on the remaining issues.  *See* Dkt. no. 35.

## Discussion

The question on a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) is whether the complaint states "a claim to relief that is plausible on its face." *See Firestone Fin. Corp. v. Meyer*, 796 F.3d 822, 826 (7th Cir. 2015) (citation omitted). In deciding the motion, the court must take "true all well-pleaded factual allegations and mak[e] all possible inferences from the allegations in the plaintiff's favor." *AnchorBank, FSB v. Hofer*, 649 F.3d 610, 614 (7th Cir. 2011) (citation omitted).  Still, the plaintiff must provide "some specific facts to support the legal claims asserted" and cannot rely on conclusory allegations to sustain his claim.  *McCauley v. City of Chicago*, 671 F.3d 611, 616 (7th Cir. 2011) (citation omitted).

## A.    Count 1

Count 1 of the complaint alleges a violation of section 1055(a)–(d).  Section 1055(a) states:  "in the case of a vested participant who does not die before the annuity starting date, the accrued benefit payable to such participant shall be provided in the form of a qualified joint and survivor annuity." 29 U.S.C. § 1055(a)(1).  ERISA defines an "accrued benefit" as "the individual's accrued benefit determined under the plan and, except as provided in section 1054(c)(3) of this title, expressed in the form of an annual benefit commencing at normal retirement age."  *Id*. § 1002(23)(A).  Under section 1055(d), a qualified JSA must be "the actuarial equivalent of a single annuity for the life of the participant."  *Id*. § 1055(d)(1)(B).

The plaintiffs contend that the defendants' use of the allegedly outdated 1971 GAMT reduced their benefits "to less than the actuarial equivalent value of their ERISA

protected benefits expressed as the single life annuity at [their] retirement date," thus violating section 1055. Compl. ¶ 107. The defendants say that this does not matter; they argue that this is the wrong comparison for section 1055 claims. Specifically, the defendants contend that section 1055 requires actuarial equivalence between the plaintiffs' benefits and an SLA *at normal retirement*—not an SLA offered at the plaintiffs' actual, early retirement date. In other words, the defendants argue that the early retirement subsidy is not part of the "accrued benefit" under section 1055(a)(1) and thus is not included when comparing the value of the JSA payments.

In support of their respective positions, the parties make several textual and other arguments. The Court addresses each in turn. Starting with the text of the statute, ERISA defines "accrued benefit" as "the individual's accrued benefit determined under the plan and . . . *expressed in the form of an annual benefit commencing at normal retirement age*." 29 U.S.C. § 1002(23)(A) (emphasis added). Because early retirement subsidies do not commence at normal retirement age, the defendants argue that the plaintiffs do not meet the second requirement under the statutory definition.

The plaintiffs suggest that the second requirement is not actually a requirement. They argue that an early retirement subsidy is an accrued benefit because "[t]he fact that the accrued benefit is normally expressed as an age-65 annuity doesn't change the fact that an early retirement subsidy is part of the benefit determined under the plan, and thus part of the accrued benefit." Pls.' Resp. at 4 (emphasis omitted). But the plaintiffs ignore the "and" in the statutory provision, which indicates that the clauses on both sides of the conjunction are required for a benefit to qualify as an accrued benefit. *See United States v. Draheim*, 958 F.3d 651, 657 (7th Cir. 2020) ("Generally, the joinder

of two clauses with the word 'and,' not 'or,' means that the legislature intended that a potential candidate for statutory relief fulfill both clauses, not just one.").  Giving meaning to every word in the statute requires finding that accrued benefits must be "expressed in the form of an annual benefit commencing at normal retirement age." *See Senne v. Village of Palatine*, 695 F.3d 597, 605 (7th Cir. 2012) (noting that "[a] basic canon of construction requires [courts] to give meaning to every word of a statute").

Although the term "accrued benefits" in section 1055(a) suggests that early retirement subsidies should not be considered for the purposes of valuing a JSA, section 1055(d)(1), which houses the actuarial equivalence requirement for qualified JSAs, is less than crystal clear.  Section 1055(d)(1) states in full:

> For purposes of this section, the term "qualified joint and survivor annuity" means an annuity—
>
>> (A) for the life of the participant with a survivor annuity for the life of the spouse which is not less than 50 percent of (and is not greater than 100 percent of) the amount of the annuity which is payable during the joint lives of the participant and the spouse, and
>>
>> (B) which is the actuarial equivalent of a single annuity for the life of the participant.
>
> Such term also includes any annuity in a form having the effect of an annuity described in the preceding sentence.

29 U.S.C. § 1055(d)(1).

The plaintiffs contend that the most "natural" interpretation of the phrase "for the life of the participant" is from retirement until death, meaning that to value a JSA under section 1055, the defendants must compare their benefits to SLAs starting at their actual retirement dates.  Pls.' Resp. at 5.  That is certainly one possible interpretation.

6

But they don't support it aside from a contention that this reading is more plausible than what they say is the defendants' interpretation, which "necessarily" is that "life of the participant" means "from age 65 to death." *Id.* For their part, the defendants do not even address the plaintiffs' interpretation of this provision or offer their own interpretation, leaving the Court with little help in deciding between the two potential interpretations presented by the plaintiffs (their own and the supposedly incorrect alternative).

The Court thus concludes—at least without a solid basis to do otherwise—that section 1055(d) is ambiguous in this regard. Nothing in the text of the statute suggests that one interpretation is better than the other, and the statute does not define the term "for the life of the participant."

Given the ambiguity, the Court must look outside the statutory text to interpret the provision. The parties both contend that the regulations interpreting section 1055 support their respective positions. Additionally, the plaintiffs argue that the purpose of section 1055 supports their position.

First, the plaintiffs argue that the regulations interpreting section 1055 "make clear that JSAs must be, at a bare minimum, the actuarial equivalent of SLAs commencing on the same date." *Id.* Specifically, they cite 26 C.F.R. § 1.401(a)-(11)(b)(2) and 26 C.F.R. § 1.401(a)-20 Q&A-16, which they contend require "the JSA [to] be equivalent to the most valuable retirement benefit available to any participant." *Id.* Section 1.401(a)-(11)(b)(2) states that "[a] qualified joint and survivor annuity must be at least the actuarial equivalent of the normal form of life annuity or, if greater, of any optional form of life annuity

offered under the plan."  Section 1.401(a)-20 states:  "In the case of a married participant, the QJSA must be at least as valuable as any other optional form of benefit payable under the plan at the same time."

The defendants cite other regulations in response.  They first cite 26 C.F.R. § 1.411(a)-11(a)(2), which states in full:

> Accrued benefit. For purposes of this section, an accrued benefit is valued taking into consideration the particular optional form in which the benefit is to be distributed. The value of an accrued benefit is the present value of the benefit in the distribution form determined under the plan. For example, a plan that provides a subsidized early retirement annuity benefit may specify that the optional single sum distribution form of benefit available at early retirement age is the present value of the subsidized early retirement annuity benefit. In this case, the subsidized early retirement annuity benefit must be used to apply the valuation requirements of this section and the resulting amount of the single sum distribution. However, if a plan that provides a subsidized early retirement annuity benefit specifies that the single sum distribution benefit available at early retirement age is the present value of the normal retirement annuity benefit, then the normal retirement annuity benefit is used to apply the valuation requirements of this section and the resulting amount of the single sum distribution available at early retirement age.

The defendants contend that this section supports their position because it states that "for the purposes of spousal consent to waive the QJSA, the accrued benefit is *not* required to include the value of a subsidized early retirement annuity." Defs.' Reply at 3.  The defendants also cite 26 C.F.R. § 1.411(a)-7(c)(6)) for the proposition that "[e]ven though the actuarial value of the early retirement benefit could exceed the value of the benefit at the normal retirement age, the normal retirement benefit would not include the greater value of the early retirement benefit because actuarial subsidies are ignored."

The Court concludes that the regulations, though perhaps less than pellucid, lend greater support to the plaintiffs' contention that actuarial equivalence under section 1055

requires a comparison between their JSAs at their actual (here, early) retirement date and the SLAs they would have received at that retirement date. The regulations that the plaintiffs cite state that a qualified JSA must be the actuarial equivalent of any "optional form of" life annuity or benefit. "An 'optional form of benefit' is not defined in ERISA, and while its meaning is obscure, it is generally a benefit that involves the right of a plan participant to choose the way in which his payments under a plan will be made or applied." *Wetzler v. Ill. CPA Soc. Found. Ret. Income Plan*, 586 F.3d 1053, 1059 (7th Cir. 2009). For example, a participant's ability to receive his benefits in the form of a lump-sum is an "optional form of benefit." *Id.* Applying this definition, a married participant's ability to receive his benefits in the form of an SLA instead of the default JSA is an "optional form of benefit." Thus the regulations the plaintiffs cite state that qualified JSAs must be the actuarial equivalent of "any other optional form of benefit" (for example, an SLA or lump-sum).

Although section 1.401(a)-(11)(b)(2) does not specifically state that a JSA must be actuarially equivalent to the most valuable retirement benefit available *at the time of the participant's retirement*, section 1.401(a)-20 does. It specifically states that, for a married participant, the qualified JSA "must be at least as valuable as any other optional form of benefit payable under the plan *at the same time*." 26 C.F.R. § 1.401(a)-20 Q&A-16. This supports the plaintiffs' interpretation that the proper point of comparison is between the JSA at the participant's actual retirement date and an SLA at that date.

The defendants' cited regulations, on the other hand, do not say what the defendants contend. For example, 26 C.F.R. § 1.411(a)-11(a)(2) does not support the contention that "for the purposes of spousal consent to waive the QJSA, the accrued

9

benefit is **not** required to include the value of a subsidized early retirement annuity." Defs.' Reply at 3. The regulation states that this is so only if the plan "specifies that the single sum distribution benefit available at early retirement age is the present value of the normal retirement annuity benefit." 26 C.F.R. § 1.411(a)-11(a)(2). When the plan "specif[ies] that the optional single sum distribution form of benefit available at early retirement age is the present value of the subsidized early retirement annuity benefit," "the subsidized early retirement annuity benefit must be used to apply the valuation requirements of this section." *Id.* The defendants do not address which category, if any, the CITGO plans fall into; regardless, the regulation clearly states that, at least in some cases, the accrued benefit does include the value of the subsidized early retirement benefit.

Similarly, 26 C.F.R. § 1.411(a)-7(c)(6)) does not support the defendants' position. The portion of the regulation that the defendants quote comes from an example provided under the definition of "normal retirement benefit." *Id.* It states that a normal retirement benefit does not include actuarial subsidies. *Id.* But section 1055 does not mention "normal retirement benefits," and whether early retirement subsidies are included in normal retirement benefits is immaterial with regard to the question in dispute: whether, under section 1055, the qualified JSA must be the actuarial equivalent of an SLA at the time of the participant's actual retirement, or at the participant's normal retirement age. The Court does not see how the definition of "normal retirement benefit" has a bearing on this issue, and the defendants offer no explanation for why it does.

Lastly, the plaintiffs contend that their interpretation best comports with ERISA's

purpose to prevent employers from giving married workers a lower pension than unmarried workers.  The defendants say that the plaintiffs offer nothing to support this contention.  Although that may be so, it is clear from the text of the statute—specifically the provision making JSAs the default for married participants and the actuarial equivalence requirement—that providing married participants and their spouses with equal pension benefits is a central goal of this aspect of ERISA.  As the Supreme Court stated in *Boggs v. Boggs*, 520 U.S. 833, 843 (1997), "[t]he statutory object of the qualified joint and survivor annuity provisions, along with the rest of § 1055, is to ensure a stream of income to surviving spouses."  "ERISA's solicitude for the economic security of surviving spouses would be undermined by allowing" employers to give a married worker a lower pension than an otherwise similarly situated unmarried worker.  *Id.*  As the plaintiffs accurately point out, the defendants' interpretation of section 1055 would "force married workers who retired early to choose between (1) more valuable types of pension benefits—e.g., SLAs and lump-sum payments—that might leave their spouses and children penniless were they to die, or (2) JSAs that were worth less."  Pls.' Resp. at 6.  Thus the purpose of the statute weighs in favor of the plaintiffs' interpretation of section 1055.

For these reasons, the Court finds that section 1055 requires actuarial equivalence between JSAs and SLAs at the time of actual retirement.  It therefore denies the defendants' motion to dismiss as to count 1.

**B.    Count 2**

In count 2 of the complaint, the plaintiffs allege that the defendants violated the actuarial equivalence requirements of sections 1054(c)(3) and 1055 because their use

of the GAMT reduced the value of their JSAs below that of similarly situated SLAs.

Section 1055(d), which contains the actuarial equivalence requirement for JSAs, was

discussed in the previous section.  Section 1054(c)(3) states:

> For purposes of this section, in the case of any defined benefit plan, if an employee's accrued benefit is to be determined as an amount other than an annual benefit commencing at normal retirement age, or if the accrued benefit derived from contributions made by an employee is to be determined with respect to a benefit other than an annual benefit in the form of a single life annuity (without ancillary benefits) commencing at normal retirement age, the employee's accrued benefit, or the accrued benefits derived from contributions made by an employee, as the case may be, shall be the actuarial equivalent of such benefit or amount determined under paragraph (1) or (2).

29 U.S.C. § 1054(c)(3).  Paragraph (1) of section 1054(c) states:

> For purposes of this section and section 1053 of this title an employee's accrued benefit derived from employer contributions as of any applicable date is the excess (if any) of the accrued benefit for such employee as of such applicable date over the accrued benefit derived from contributions made by such employee as of such date.

*Id.* at § 1054(c)(1).  Paragraph (2) states, in relevant part:

> In the case of a defined benefit plan, the accrued benefit derived from contributions made by an employee as of any applicable date is the amount equal to the employee's accumulated contributions expressed as an annual benefit commencing at normal retirement age, using an interest rate which would be used under the plan under section 1055(g)(3) of this title (as of the determination date).

*Id*. at § 1054(c)(2)(B).

The defendants seem to argue in response that neither section prohibits

employers from using unreasonable mortality assumptions.  *See* Defs.' Mot. at 14 ("If

Congress had wished to impose specific standards for actuarial equivalency and require

reasonable assumptions, it certainly could have."); *id.* ("Whether or not the Plans used a

'reasonable' mortality table, that does not constitute a violation under §§ 1054(c)(3) or

1055.").  But it cannot possibly be the case that ERISA's actuarial equivalence requirements allow the use of unreasonable mortality assumptions.  Taken to the extreme, the defendants' argument suggests that they could have used any mortality table—presumably, even one from the sixteenth century—to calculate the plaintiffs' JSAs.  If this were true, the actuarial equivalence requirement would be rendered meaningless.

The plain meaning of the term "actuarial equivalence" also supports the plaintiffs' interpretation.  To be equivalent means to be "equal in force, amount, or value." *Equivalent*, Merriam-Webster, https://www.merriam-webster.com/dictionary/equivalent (last visited February 9, 2022).  Only accurate and reasonable actuarial assumptions can convert benefits from one form to another in a way that results in equal value between the two.

The defendants also argue that the GAMT that the plans used is not unreasonable because it is listed under the IRS's definition of "standard mortality table" and is thus suitable for use in other contexts.  *See* 26 C.F.R. § 1.401(a)(4)-12.  But whether or not the GAMT is suitable for use in other contexts does not address whether or not it is suitable in *this* context.  If, as the plaintiffs allege, the GAMT's mortality assumptions are no longer accurate, resulting in an inaccurate conversion of the plaintiffs' benefits from an SLA to a JSA and shorting them on benefits, then use of the GAMT would violate ERISA's actuarial equivalence requirement.

Finally, the defendants argue in their reply brief that the plaintiffs' early retirement subsidy forecloses their ability to bring a claim under section 1054(c)(3).  The Court declines to consider this argument because the defendants did not bring it up until the

13

reply brief. *Wonsey v. City of Chicago*, 940 F.3d 394, 398 (7th Cir. 2019) ("[A]rguments raised for the first time in a reply brief are waived.").

For these reasons, the Court denies the defendants' motion to dismiss count 2.

**C.    Count 3**

Count 3 of the complaint alleges violations of section 1053(a)'s anti-forfeiture requirement, which states:  "Each pension plan shall provide that an employee's right to his normal retirement benefit is nonforfeitable upon the attainment of normal retirement age . . . ."  29 U.S.C. § 1053(a).  The plaintiffs contend that the defendants caused them to forfeit their benefits when they used the outdated mortality tables to calculate their JSAs, resulting in artificially reduced payments.  In support of dismissal of this claim, the defendants make two arguments.  First, they argue that section 1053(a) does not apply to participants who received early retirement benefits like the plaintiffs.  Second, they argue that, even if the section applies, it only protects the plaintiffs' entitlement to receive benefits, period, and not the amount or method of calculating the benefits.

The plaintiffs' reading of the statute is more persuasive.  First, section 1053(a) *does* apply to plan participants who receive early retirement benefits.  As the plaintiff points out, the statute defines "normal retirement benefit" as "the greater of the early retirement benefit under the plan, or the benefit under the plan commencing at normal retirement age."  *Id.* § 1002(22).  The defendants' interpretation would mean that, despite the fact that, under the statute, a normal retirement benefit includes an early retirement benefit, this benefit is not protected under section 1053(a) until the attainment of normal retirement age.  That makes no sense.

The case the defendant cites, *Contilli v. Local 705 International Brotherhood of*

14

*Teamsters Pension Fund*, 559 F.3d 720 (7th Cir. 2009), does not demand a different conclusion.[1]  The defendants quote a portion of *Contilli* that states:  "The anti-forfeiture rule in § 1053(a) applies, however, only to benefits available on a person's normal retirement date."  *Id.* at 723.  The defendants are taking this statement out of context.  The court in *Contilli* was not discussing the issue at hand, namely, whether section 1053(a) applies to early retirement benefits.  Rather, the court was discussing whether the plaintiff was entitled to a benefit increase that occurred *after* he retired.  Specifically, the plaintiff in *Contilli*, who applied for pension benefits a couple months after retiring, brought suit seeking pension benefits for the time between his retirement and his application.  The court reasoned that "if [the plaintiff] want[ed] his pension benefits for November and December 1997 and January 1998 . . . he must accept the [lower] pension schedule that was in force in October 1997, when he retired."  *Id.*

The defendants also argue that the plaintiffs' reading of the statute would "essentially eliminate the ability of employers to offer more generous early retirement benefits."  Defs.' Reply at 8.  This is so, the defendants contend, because "the right to a subsidy would be lost (i.e. forfeited) when a participant reaches normal retirement age."  *Id.*  But the defendants conflate an early retirement benefit and an early retirement subsidy.  The plaintiffs contend that their early retirement benefits, namely, the monthly pension payments they received after early retirement, are protected under section 1053(a).  These do not terminate when the plaintiffs reach normal retirement age; the

---

[1] The defendants also cite a Fourth Circuit case and two district court cases for support.  These cases are not binding on the Court, and it declines to follow them because they are unpersuasive.  *See United States v. Glaser*, 14 F.3d 1213, 1216 (7th Cir. 1994) (noting that "[o]pinions 'bind' only within a vertical hierarchy").

plaintiffs will continue receiving them until their deaths, after which point their surviving spouses will be paid benefits. What the defendants refer to, on the other hand, is the early retirement subsidy, or the extra money the plaintiffs received as an incentive to retire early. The plaintiffs are not contending that their early retirement subsidies were improperly calculated and thus forfeited. Rather, they contend that their early retirement pension benefits, which fall under the statute's definition of "normal retirement benefit," were improperly calculated and thus forfeited.

The Court turns next to the defendants' second argument for dismissing the section 1053(a) claim. The Court concludes that reducing a participant's benefits by using unreasonable actuarial assumptions can constitute a forfeiture of rights under section 1053(a). Regulations interpreting this provision directly support this conclusion: "Certain adjustments to plan benefits such as adjustments in excess of reasonable actuarial reductions, can result in rights being forfeitable." 26 C.F.R. § 1.411(a)-4(a). The defendants cite several Supreme Court cases in support of their contention that section 1053(a) forfeiture is about total loss of benefits, rather than the value of the benefits. *See* Defs.' Reply at 7–8. These cases state that forfeiture "*normally* connotes a total loss" of benefits, but normally does not mean always, and the cases do not foreclose the possibility that actuarial assumptions used to calculate pension benefits might be so unreasonable that their use causes a forfeiture of benefits. *See Nachman Corp. v. Pension Benefit Guar. Corp.*, 446 U.S. 359, 372 (1980) (emphasis added). Furthermore, the Seventh Circuit in *Contilli*—the case the defendants cite for support regarding their first argument—specifically stated that "a reduction in the total value of all monthly benefits is a kind of forfeiture." *Contilli*, 559 F.3d at 721–22.

16

Lastly, the defendants argue that the plaintiffs' rights were not forfeited because their benefits were actually increased by the early retirement subsidy. Again, however, this argument has been forfeited because it was raised for the first time in the reply brief. *Wonsey*, 940 F.3d at 398.

For these reasons, the Court finds that the plaintiffs have stated a claim under section 1053(a).

**D.    Count 4**

Count 4 of the plaintiffs' complaint alleges that the Benefits Plan Committee breached its fiduciary duties. The defendants argue that this claim should be dismissed because the statutory provisions under which the plaintiffs bring their claims do not authorize the remedies that they are requesting.[2]

Before the Court assesses the defendants' arguments, a brief overview of the remedies authorized under ERISA is needed. Section 1132 provides a list of remedies that parties can seek under ERISA. There are three provisions of this section that are relevant in this case. First, section 1132(a)(1)(B) allows a participant "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." 29 U.S.C. § 1132(a)(1)(B). Second, section 1132(a)(2) allows a participant to sue "for appropriate relief" for breaches of fiduciary duty under section 1109. *Id.* § 1132(a)(2). Third, section

---

[2] In the memorandum in support of the defendants' motion to dismiss, they argue that ERISA does not require the fiduciary to ensure actuarial equivalence. They seem to abandon this argument, however, as they do not reference it in their reply brief. *See* Defs.' Reply at 9–15. The defendants also make a cursory argument that count 4 should be dismissed because the plaintiffs have failed to state a claim for violation of ERISA in the previous counts. Because the Court has declined to dismiss the other counts, this argument fails.

1132(a)(3) allows a participant to (A) "enjoin any act or practice which violates any provision of [ERISA] or the terms of the plan," or (B) "obtain other appropriate equitable relief." *Id.* § 1132(a)(3). In the complaint, the plaintiffs state that they are seeking relief under sections 1132(a)(2) and 1132(a)(3) but not section 1132(a)(1)(B).

With respect to the plaintiffs' fiduciary duty claims, the defendants contend that the plaintiffs cannot sue under section 1132(a)(2) because this provision only allows recovery on behalf of the plan, and the plaintiffs are suing for individual relief. The defendants also argue that the plaintiffs cannot sue under section 1132(a)(3) because they are seeking individual benefit payments that they ought to request under section 1132(a)(1)(B).

Starting with section 1132(a)(3), the defendants are correct that many district courts in this circuit have dismissed claims under section 1132(a)(3) when the plaintiff has an adequate remedy under section 1132(a)(1)(B). *See Andujar v. Sun Life Assurance Co. of Can.*, No. 14 C 2792, 2014 WL 4099800, at *2–4 (N.D. Ill. Aug. 20, 2014) (collecting cases). But this rule does not apply in cases where a significant portion of the plaintiffs' requested relief is not available under section 1132(a)(1)(B).

The Supreme Court's decision in *CIGNA Corp. v. Amara*, 563 U.S. 421 (2011) addressed this point. In *Amara*, the Supreme Court reviewed whether section 1132(a)(1)(B) authorized the district court to reform the disputed plan and issue an injunction ordering the plan to pay benefits accordingly. *Id.* at 424. The Court concluded that, although the injunction allowed the participant to "recover benefits due . . . under the terms of the plan" as authorized by section 1132(a)(1)(B), nothing in that section "grant[ed] a court the power to *change* the terms of the plan as they previously

18

existed." *Id.* at 435–36.  The Court further held that section 1132(a)(3) authorized the district court to reform the plan because section 1132(a)(3) authorizes categories of relief that "traditionally speaking . . . were typically available in equity." *Id.* at 439 (internal quotations marks omitted).

In determining that the district court's issued remedies were equitable, rather than legal, in nature, the Supreme Court noted that the case was of the kind of lawsuit that, "before the merger of law and equity, respondents could have brought only in a court of equity, not a court of law" because it "concern[ed] a suit by a beneficiary against a plan fiduciary (whom ERISA typically treats as a trustee) about the terms of a plan (which ERISA typically treats as a trust)." *Id.*  With respect to the reformation remedy in particular, the Court noted that reformation of an employee benefit plan is similar to contract reformation and estoppel, which were both traditional equitable remedies.  *Id.* at 440–41.  With respect to the district court's injunction requiring the payment of monetary relief, the Court stated that "the fact that this relief takes the form of a money payment does not remove it from the category of traditionally equitable relief." *Id.* at 441.  It noted that courts in equity traditionally "possessed the power to provide relief in the form of monetary 'compensation' for a loss resulting from a trustee's breach of duty." *Id.*

Similarly, in this case, the plaintiffs' requested relief is available under section 1132(a)(3).[3]  Like in *Amara*, the case "concerns a suit by a beneficiary against a plan fiduciary . . . about the terms of a plan."  And, as in *Amara*, the requested relief is

_____

[3] This difference distinguishes this case from those the defendants cite.  *See Magin v. Monsanto Co.*, 420 F.3d 679 (7th Cir. 2005); *Bryant v. Int'l Fruit Prod. Co.*, 886 F.2d 132 (6th Cir. 1989).

equitable in nature. For example, the plaintiffs request "declaratory judgment that the Plan's actuarial assumptions for joint and survival annuities applicable to the Class violate [several of] ERISA's" provisions and that "the Benefit Plans Committee breached its fiduciary duties in violation of ERISA." Compl. at 31–32. Declaratory relief is a traditionally equitable remedy that does not fit within any of the categories of relief under section 1132(a)(1)(B). *See Amara*, 563 U.S. at 440. This is true with respect to the rest of the plaintiffs' requested remedies: injunctions and declarations, *id.* at 440; reformation of the plan, *id.* at 440–41; disgorgement and restitution, *Liu v. S.E.C.*, 140 S. Ct. 1936, 1943–44 (2020); an accounting, *id.* at 1944; and a surcharge, *Amara*, 563 U.S. at 442.

The defendants spill much ink arguing that the plaintiffs seek "individual benefit payments" that must be brought under section 1132(a)(1)(B). *See* Defs.' Reply at 12. But this mischaracterizes the plaintiffs' requested relief. The plaintiffs seek an injunction "to recalculate and pay all amounts owed" to the class members. Compl. at 32. This is exactly the same sort of relief that the district court ordered in *Amara*. For these reasons, the Court concludes that the plaintiffs have a remedy under 1132(a)(3) for their breach of fiduciary duty claim.

Because the Court concludes that the plaintiffs have a remedy under section 1132(a)(3), it need not decide whether they also have a remedy under section 1132(a)(2). On a motion to dismiss a claim, it is enough that the plaintiffs show that they have *some* remedy under the cited statute. *See Sidney S. Arst Co. v. Pipefitters Welfare Educ. Fund*, 25 F.3d 417, 421 (7th Cir. 1994) ("The complaint need not support a viable claim only under the particular legal theory intended by the plaintiff."). Whether

or not the plaintiffs have a specific remedy is a point the Court need not determine at this stage in the case; rather, a "district court has a duty to consider whether a plaintiff's allegations could provide relief under *any* available legal theory." *Id.*

## Conclusion

For the foregoing reasons, the Court denies the defendants' motion to dismiss [dkt. no. 30]. The parties are directed to confer regarding a discovery and pretrial schedule and are to file a joint status report with a proposal, or alternative proposals if they cannot agree, by February 28, 2022.

_____
MATTHEW F. KENNELLY
United States District Judge

Date: February 22, 2022