**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **LESLIE URLAUB, MARK PELLEGRINI,** | ) | |
| **and MARK FERRY, on behalf of themselves** | ) | |
| **and all others similarly situated,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. 21 C 4133** |
| | ) | |
| **CITGO PETROLEUM CORPORATION,** | ) | |
| **et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

**<u>MEMORANDUM OPINION AND ORDER</u>**

MATTHEW F. KENNELLY, District Judge:

Leslie Urlaub, Mark Pellegrini, and Mark Ferry have brought this suit on behalf of a class of similarly situated persons against their former employer CITGO Petroleum Corp., two defined benefit plans sponsored by CITGO, and the fiduciary of the plans. They allege that the defendants have violated several provisions of the Employee Retirement Income Security Act of 1974 (ERISA) by using out-of-date mortality assumptions to calculate their benefits under the plans. The defendants have moved for summary judgment on all of the plaintiffs' claims, arguing that (1) the claims are untimely, (2) the plaintiffs failed to exhaust the internal remedies provided by their plans, and (3) they have not provided evidence that its use of the out-of-date mortality assumptions resulted in an unreasonable calculation of benefits. For the reasons discussed below, the Court grants the defendants' motion with respect to Pellegrini's claim for breach of fiduciary duty but otherwise denies the motion.

**Background**

The Court discussed the background of the case in its previous order denying the defendants' motion to dismiss. *See Urlaub v. CITGO Petroleum Corp.*, No. 21 C 4133, 2022 WL 523129, at *1–2 (N.D. Ill. Feb. 22, 2022). The Court will briefly summarize that background and will discuss additional facts relevant to the defendants' motion for summary judgment.

Urlaub, Pellegrini, and Ferry are former employees of CITGO Petroleum Corporation. CITGO sponsors two defined benefit plans. Urlaub is a participant in the CITGO Petroleum Corporation Salaried Employees' Pension Plan. Pellegrini and Ferry are participants in the Retirement Plan of CITGO Petroleum Corporation and Participating Subsidiary Companies. The administrator and fiduciary of the plans is the Benefit Plans Committee (the Committee).

When the plaintiffs retired from CITGO, they were given packets with pension options. They chose to receive their benefits in the form of a joint and survivor annuity (JSA), which means that each of them will receive a monthly pension for his life, plus a monthly pension for the life of a surviving spouse. Participants selecting a JSA receive a lower pension benefit during their own life to account for the fact that their surviving spouse will receive pension benefits after they die. The amount of money the surviving spouse receives depends on the type of JSA that the participant selects. A standard JSA (what Urlaub chose) provides a spouse with a monthly pension equal to 50% of the amount that the participant received. In contrast, a 75% JSA (what Pellegrini chose) provides a spouse with a monthly pension equal to 75% of the amount that the

participant received.  Finally, a 100% JSA (what Ferry chose) provides a spouse a monthly pension equal to 100% of the amount that the participant received.

Under ERISA, "qualified" JSA pension options must be the "actuarial equivalent of a single annuity for the life of the participant."  29 U.S.C. § 1055(d)(1)(B).  In other words, the total value of payments made over the expected life of the participant and his or her spouse as part of the JSA pension must be equal to the total value of payments that would have been made over the expected life of the participant had he or she selected a single-life annuity (SLA).  For participants who began receiving benefits prior to January 1, 2018, the defendants used the following assumptions to convert their SLAs to qualified JSAs: (1) an eight percent annual investment return, compounded annually, and (2) mortality rates from the 1971 Group Annuity Mortality Table projected to 1975.

Before they retired, each plaintiff received an informational packet about pension benefits.  This packet included, among other documents, an "Explanation of Pension Benefit Options" which stated "that participants will receive an 'adjusted monthly benefit' if they select a JSA" and a "Benefit Election Form" that provided "estimates of monthly pension amounts" under the various JSA and SLA options.  Defs.' Stmt. of Material Facts ¶ 24.  The packet also included a page entitled "Summary of Relative Value Amounts" that stated:

> This form presents to you the relative value of your benefit options compared to the Qualified Joint and Survivor Annuity (QJSA) in the [Retirement Plan].  This comparison is intended to allow you to compare the total actuarial present value of distributions paid in different forms. The comparison is made by comparing the value of the optional forms to a common form (QJSA).  The conversion for all optional forms except the level income option and the lump sum, if applicable, is done using interest of 8.00% and mortality assumptions of 1971 Group annuity mortality table

projected to 1975. (For participants, it is 95% male and 5% female. For beneficiaries, it is 5% male and 95% female). For the level income option and lump sum, if applicable, the comparison is done using the prescribed interest rate and mortality rates under Code Section 417(e)(3).

*Id*. ¶¶ 25, 34. Below this statement was a chart that stated that the "relative value" of certain benefits options were the "[e]quivalent" to the qualified JSA option:

Listed in the chart below are the relative values of your payment options calculated as of your Annuity Starting Date (**12/01/2016**):

| Pension Payment Option* | Relative Value to QJSA |
|---|---|
| Single Life Annuity Option | QJSA Form |
| 10 Year Certain & Continuous | Equivalent |
| Standard Joint and Survivor / 50% Joint and Survivor Annuity Option | Equivalent |
| 75% Joint and Survivor Annuity Option | Equivalent |
| 100% Joint and Survivor Annuity Option | Equivalent |
| Level Income Option with Single Life Annuity Option | 85.90% |

Pls.' Stmt. of Add'l Material Facts ¶ 30.[1] Urlaub finalized his retirement benefits elections on October 17, 2016 and received his first pension payment on January 1, 2017. Pellegrini finalized his retirement benefits elections on May 23, 2014 and received his first pension payment on August 1, 2014. Ferry finalized his retirement benefits elections on March 22, 2017 and received his first pension payment on June 1, 2017.

The parties dispute exactly when CITGO's consulting firm, Mercer, first recommended that CITGO review the plans' actuarial assumptions, including the use of 1971 Mortality Table. At some point, however, Mercer recommended that CITGO

---

[1] The charts were not identical for each plaintiff, but the defendants have not suggested that there are any differences in the charts that are material for purposes of their motion for summary judgment.

update its plans' actuarial assumptions. On November 5, 2015, the Benefit Plans Committee voted to recommend amending the definition of actuarial equivalence under both plans to use updated mortality assumptions. CITGO approved the amendments at the end of 2016. The changes became effective for benefits starting on or after January 1, 2018.

On August 3, 2021, Urlaub and Pellegrini sued CITGO, the plans, and the Committee on behalf of a class of similarly situated persons, alleging that the use of the 1971 Mortality Table resulted in illegally reduced pension benefits. On August 26, 2022, they filed an amended complaint adding Ferry as a plaintiff. The amended complaint contains four counts, all of which center on the defendants' use of the outdated 1971 Mortality Table.

Count one of the plaintiffs' complaint alleges that the defendants violated 29 U.S.C. § 1055(a). Section 1055(a) states that "in the case of a vested participant who does not die before the annuity starting date, the accrued benefit payable to such participant shall be provided in the form of a qualified joint and survivor annuity." 29 U.S.C. § 1055(a)(1). Under section 1055(d), a qualified JSA must be "the actuarial equivalent of a single annuity for the life of the participant." *Id*. § 1055(d)(1)(B). The plaintiffs contend that the defendants' use of the allegedly outdated 1971 Mortality Table reduced their benefits "to less than the actuarial equivalent value of their ERISA protected benefits expressed as the single life annuity at [their] retirement date," thus violating section 1055. Am. Compl. ¶ 108.

Count two of the plaintiffs' complaint alleges that the defendants violated the actuarial equivalence requirements of 29 U.S.C. § 1054(c) because the use of the 1971

Mortality Table reduced the value of their JSAs below that of similarly situated SLAs.

Section 1054(c)(3) states:

> For purposes of this section, in the case of any defined benefit plan, if an employee's accrued benefit is to be determined as an amount other than an annual benefit commencing at normal retirement age, or if the accrued benefit derived from contributions made by an employee is to be determined with respect to a benefit other than an annual benefit in the form of a single life annuity (without ancillary benefits) commencing at normal retirement age, the employee's accrued benefit, or the accrued benefits derived from contributions made by an employee, as the case may be, shall be the actuarial equivalent of such benefit or amount determined under paragraph (1) or (2).

29 U.S.C. § 1054(c)(3).  Paragraph (1) of section 1054(c) states:

> For purposes of this section and section 1053 of this title an employee's accrued benefit derived from employer contributions as of any applicable date is the excess (if any) of the accrued benefit for such employee as of such applicable date over the accrued benefit derived from contributions made by such employee as of such date.

*Id.* § 1054(c)(1).  Paragraph (2) states, in relevant part:

> In the case of a defined benefit plan, the accrued benefit derived from contributions made by an employee as of any applicable date is the amount equal to the employee's accumulated contributions expressed as an annual benefit commencing at normal retirement age, using an interest rate which would be used under the plan under section 1055(g)(3) of this title (as of the determination date).

*Id.* § 1054(c)(2)(B).

Count three of the plaintiffs' complaint alleges that the defendants violated 29 U.S.C. § 1053(a)'s anti-forfeiture requirement, which states that "[e]ach pension plan shall provide that an employee's right to his normal retirement benefit is nonforfeitable upon the attainment of normal retirement age . . . ."  The plaintiffs contend that the defendants caused them to forfeit their benefits when they used the outdated mortality tables to calculate their JSAs, resulting in artificially reduced payments.

Finally, count four of the plaintiffs' complaint alleges that the Benefits Plan Committee breached its fiduciary duty under 29 U.S.C. § 1104, including its duty of loyalty to participants and its duty of prudence. They allege the Committee violated its duty by, for example, "[d]isloyally providing inaccurate and misleading information to Class members" and "[f]ailing to act prudently when determining benefits owed to Plan participants." Am. Compl. ¶ 137.

The defendants moved to dismiss all of the plaintiffs' claims; the Court denied the motion. *See Urlaub v. CITGO Petroleum Corp.*, No. 21 C 4133, 2022 WL 523129 (N.D. Ill. Feb. 22, 2022). After conducting discovery, the plaintiffs filed a motion for class certification, and the defendants filed a motion for summary judgment.

## Discussion

Summary judgment is appropriate only if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court must "construe all facts and draw all inferences in the light most favorable to the non-moving party." *Vesey v. Envoy Air, Inc.*, 999 F.3d 456 (7th Cir. 2021). "On summary judgment a court may not make credibility determinations, weigh the evidence, or decide which inferences to draw from the facts; these are jobs for a factfinder. Rather, the court has one task and one task only: to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial." *Johnson v. Advocate Health & Hosps. Corp.*, 892 F.3d 887, 893 (7th Cir. 2018).

## A. Timeliness

The defendants argue that they are entitled to summary judgment because there is no genuine dispute that the plaintiffs' claims are untimely. The Court will first address

the timeliness of the plaintiffs' claims under 29 U.S.C. §§ 1055, 1054, and 1053 (counts 1, 2, and 3) and then will address the claims under 29 U.S.C. § 1104 (count 4).

### 1. Claims under 29 U.S.C. §§ 1055, 1054, and 1053

The parties agree that, because ERISA does not specify a statute of limitations for claims for violations of sections 1055, 1054, and 1053, the Court must "borrow the most analogous statute of limitations from state law." *Young v. Verizon's Bell Atl. Cash Balance Plan*, 615 F.3d 808, 815–16 (7th Cir. 2010). The parties also agree that Texas law applies and that the applicable limitations period is four years. The parties dispute, however, when the plaintiffs' claims accrued and started the clock on the four-year limitations period. The defendants argue that the clock started when the plaintiffs received their benefits packets explaining that the SLA-to-JSA calculation was based on the use of the 1971 Mortality Table and an eight percent interest rate, or, at the latest, when each plaintiffs received his first benefits check following retirement. Because the complaint in this action was filed in August 2021 and the plaintiffs all retired and received their first pension payments before August 2017, either of the defendants' proposed accrual dates would render all three plaintiffs' claims untimely. The plaintiffs argue that the clock started only when they discovered that they were entitled to higher payments after speaking with their lawyers.

"Although federal courts borrow state limitations periods for certain ERISA claims, the accrual of those claims is governed by federal common law." *Young*, 615 F.3d at 816. "The general federal common law rule is that an ERISA claim accrues when the plaintiff knows or should know of conduct that interferes with the plaintiff's ERISA rights." *Id.* at 817.

8

The defendants argue that each plaintiff received a benefits packet that explained that disclosed the amount the plaintiff would receive as a JSA and that the SLA-to-JSA conversion was calculated based on the 1971 Mortality Table.  The defendants argue that, because the plaintiffs' claims hinge on the outdatedness of the 1971 Mortality Table, they knew or should have known of the "the essential facts of the transaction or conduct constituting the violation" when they received their benefits packets disclosing that fact.  *Rush v. Martin Peterson Co.*, 83 F.3d 894, 896 (7th Cir. 1996).

The plaintiffs respond that the defendants' disclosure of the use of the 1971 Mortality Table in the benefits packet was insufficient to trigger the statute of limitations because "[d]efendants have not shown that Plaintiffs have any actuarial expertise" or that they knew or were "on notice" before bringing this action that their JSAs were improperly calculated.  Pls.' Resp. at 4.  The plaintiffs also argue that, because the benefits packet stated that the JSA's value was "equivalent" to an SLA's value, they had no reason to suspect that the defendants' use of the 1971 Mortality Table was somehow decreasing their JSA benefits.

Generally, whether a person knew or should have known something is a question of fact that must be resolved at trial.  *Cf. Arroyo v. United States*, 656 F.3d 663, 667 (7th Cir. 2011) ("The district court's finding regarding the governing claim accrual rule is a legal determination" but the court's "determination of the date that the [plaintiff] knew that [the plaintiff's injuries] could have been caused by his doctors, or the date that a reasonably diligent person would have discovered the same, constitutes a factual finding."); *Brock v. TIC Int'l Corp.*, 785 F.2d 168, 171 (7th Cir. 1986) (superseded by

statute on other grounds) ("The question when a reasonable person would have known that his legal rights had been invaded, so that the statute of limitations began to run, is a question of fact.").  This is true "even when the district court's findings do not rest on credibility determinations, but are based instead on physical or documentary evidence or inferences from other facts."  *Brock*, 785 F.2d at 171.

The Seventh Circuit has indicated that "it is certainly possible that generic Plan communications" can trigger the limitations period by disclosing the essential facts underlying the alleged ERISA violation.  *Thompson v. Ret. Plan for Emps. of S.C. Johnson & Son, Inc.*, 651 F.3d 600, 606 (7th Cir. 2011).  But the communication must be more than "a collection of hints" or "oblique guidance about the crucial flaw at issue." *Id.* at 605–06.  There may be some circumstances under which there is no genuine dispute whether a plan communication was sufficiently clear such that a participant should have known about the crucial flaw at issue.

The Court cannot say that the defendants have shown that no reasonable factfinder could conclude that the packets were insufficient to apprise participants that their JSA benefits might be less than the actuarial equivalent of their hypothetical SLA benefits.  Both parties point to evidence in support of their competing views regarding when participants knew or should have known the key facts underlying their ERISA claims that would start the limitations clock running.  Resolving this dispute requires the Court to weigh the evidence on each side and draw a conclusion regarding what the plaintiffs knew or should have known on a given date.  That is a task for trial, not summary judgment.

The defendants argue in the alternative that the statute of limitations was triggered, at the latest, when the plaintiffs received their first pension payments. They cite to *Thompson* for the proposition that the statute of limitations accrues "upon payment of benefits following consistent communications about pension benefits." Defs.' Reply at 2. But the Seventh Circuit did not establish a categorical rule that the receipt of a benefits check *always* starts the clock on plaintiffs' ERISA claims. Rather, the court's holding was premised on the particular facts of that case. *See Thompson*, 651 F.3d at 607 (distinguishing an earlier case, *Young v. Verizon's Bell Atlantic Cash Balance Plan*, 615 F.3d 808 (7th Cir. 2010), in which it held that the receipt of a benefits check did *not* trigger the limitations period based on the differing facts of the two cases). Thus, although the plaintiffs' receipt of benefits checks is relevant to the accrual question, it does not necessarily resolve it as a matter of law.

In sum, the Court concludes that there is a genuine dispute regarding when the plaintiffs' ERISA claims accrued that must be resolved at trial.

## 2. Breach of fiduciary duty claim

In contrast to the previous claims, ERISA does specify time limitations for claims for breach of fiduciary duty. The statute provides that plaintiffs must bring suit for breach of fiduciary duty "after the earlier of":

> (1) six years after (A) the date of the last action which constituted a part of the breach or violation, or (B) in the case of an omission the latest date on which the fiduciary could have cured the breach or violation, or
>
> (2) three years after the earliest date on which the plaintiff had actual knowledge of the breach or violation;
>
> except that in the case of fraud or concealment, such action may be commenced not later than six years after the date of discovery of such breach or violation.

29 U.S.C. § 1113.

The parties dispute both which limitations period applies and when the plaintiffs' claim for breach of fiduciary duty accrued. The defendants argue that all three plaintiffs had "actual knowledge" of the alleged breach. Again, the defendants point to the fact that the plaintiffs all received and signed the benefits packets that stated that the relevant conversions were calculated using the 1971 Mortality Table. In the defendants' view, this means that the plaintiffs had "knowledge of the essential facts of the transaction or conduct constituting the violation." Defs.' Mot. for Summ. J. at 7 (quoting *Rush*, 83 F.3d at 896). "On that basis," the defendants argue, the Court "should find that the three-year limitations period applies, that it runs from the date that the Plaintiffs received their benefit packets, and that each Plaintiff's fiduciary duty claim is time barred." *Id.* The plaintiffs deny that they were aware that the defendants' use of the 1971 Mortality Table lowered the value of their JSAs.

As the Court has discussed with respect to the plaintiffs' claims under sections 1053, 1054, and 1055, there is a genuine dispute whether the plaintiffs knew or should have known the essential facts of their claims as a result of the defendants' communications. Summary judgment on the timeliness of the fiduciary duty claims based on the plaintiffs' actual knowledge is precluded for the same reasons. Moreover, the Supreme Court has made clear that there is an important distinction between "'*actual knowledge*' and the 'hypothetical' knowledge that a reasonably diligent plaintiff would have." *Intel Corp. Inv. Pol'y Comm. v. Sulyma*, 140 S. Ct. 768, 776–77 (2020). As a result, "§ 1113(2) requires more than evidence of disclosure alone." *Id.* at 777. "That all relevant information was disclosed to the plaintiff is no doubt *relevant* in judging

whether he gained knowledge of that information.  To meet § 1113(2)'s 'actual knowledge' requirement, however, the plaintiff must in fact have become aware of that information."  *Id.*  The defendants cite to a handful of reasons why they believe the plaintiffs had actual knowledge, such as testimony from Urlaub's deposition that he recalled reading the actuarial assumptions used by CITGO to calculate his benefits, but again, this is a dispute that must be resolved at trial.

Next, defendants argue that even if the six-year limitations period of section 1113(1) applies, Pellegrini's fiduciary-duty claim is untimely.  (The parties agree that, under the six-year limitations period, Urlaub and Ferry's claims are timely.)  The Supreme Court has explained that section 1113(1) is "a statute of repose, which 'effect[s] a legislative judgment that a defendant should be free from liability after the legislatively determined period of time.'"  *Intel Corp. Inv. Pol'y Comm.*, 140 S. Ct. at 774 (quoting *Cal. Pub. Emps. Ret. Sys. v. ANZ Secs., Inc.*, 582 U.S. 497, 505 (2017)).  The six-year period thus "starts running not when the claim accrues, but "on 'the date of the last culpable act or omission of the defendant.'"  *Appvion, Inc. Ret. Sav. & Emp. Stock Ownership Plan v. Buth*, --- F.4th ---, No. 23-1073, 2024 WL 1739032, at *11 (7th Cir. Apr. 23, 2024) (quoting *Cal. Pub. Emps. Ret. Sys*, 582 U.S. at 505).

The Court agrees with the defendants that the latest possible culpable act or omission of the Benefit Plans Committee (the only defendant for the fiduciary-duty claims) was the final calculation and payment of each plaintiffs' monthly benefits payment using the 1971 Mortality Table.  The plaintiffs filed suit on August 3, 2021, so the Committee must have issued Pellegrini's benefits payment on August 3, 2015 at the

latest for his claim to be timely.  It is undisputed, however, that Pellegrini received his first benefits check on August 1, 2014.

Pellegrini responds that his claim is timely because the Committee "continue[s] to underpay [him] every month in repeated violation of their fiduciary duties under ERISA, [and so] his claims are timely regardless of when they *first* started to underpay him." Pls.' Resp. at 7.  But the plaintiffs identify no new culpable act that corresponds with the issuance of each monthly check.  There is no allegation, for example, that the Committee reconsiders or recalculates the SLA-to-JSA conversion rate anew with each monthly check.  Rather, the conversion rate is determined and applied at the time the participant retires, and the monthly amounts are finalized.  The plaintiffs cite to *Meagher v. International Association of Machinists & Aerospace Workers Pension Plan*, 856 F.2d 1418 (9th Cir. 1988), in which the court held that the issuance of each monthly benefits check restarted the clock on the statute of repose.  The Court does not find *Meagher* persuasive.  As another court in this district has explained, "contrary to the nearly quarter-century-old holding in *Meagher*[,] the continuing-violation theory applies in this Circuit only when fresh decisions constituting fresh violations are made" and "*not* merely where a single decision has lasting effects." *Webb v. Gardner, Carton & Douglas LLP Long Term Disability Plan*, 899 F. Supp. 2d 788, 795 (N.D. Ill. 2012).  The Court therefore joins the "many courts—indeed, including the Ninth Circuit (!)—[that] have explicitly rejected the application of a 'continuing breach' theory to an ERISA case." *Id.* (collecting cases).

Finally, Pellegrini argues that the exception to the six-year statute of repose for fraud or concealment applies because the benefit packets "concealed" the breach by

stating that the JSA's value was "equivalent" to an SLA's value and "continued to conceal their breach by failing to come clean on this issue for pre-2018 retirees like Mr. Pellegrini even after receiving Mercer's advice and changing their JSA benefit calculations for new retirees." Pls.' Resp. at 8. This is insufficient, however, to invoke the fraud-or-concealment exception. The Seventh Circuit has held that "ERISA's use of the phrase 'fraud or concealment' adopts the fraudulent-concealment doctrine, which "refers to 'steps taken by wrongdoing fiduciaries to cover their tracks'—that is, it focuses on "'steps taken by the defendant to hide the fact of the breach rather than . . . the underlying nature of plaintiffs' claim.'" *Appvion, Inc. Ret. Sav. & Emp. Stock Ownership Plan*, 2024 WL 1739032, at *4 (quoting *Radiology Ctrs., S.C. v. Stigel, Nicolaus & Co.*, 919 F.2d 1216, 1220–21 (7th Cir. 1990)). The claim at issue in this case centers on the fact that the plaintiffs' JSAs were not, in fact, the actuarial equivalent to a hypothetical SLA. But the plaintiffs have not pointed to any "steps taken by [the Committee] to cover their tracks" or "to hide the fact of the breach." *Id.* Thus the fraud or concealment exception therefore does not apply. The Court concludes that Pellegrini's claim for breach of fiduciary duty is barred by ERISA's statute of repose.

## B. Exhaustion

The defendants next argue that the Court should grant summary judgment because the plaintiffs failed to exhaust the internal remedies available to them. The plaintiffs in this case concede that they have not attempted to seek redress through the procedures provided by their respective plans, but they argue that this does not bar their suit because there is no reason for the Court to impose an exhaustion requirement under the facts of this case.

"Although ERISA's text is silent on the issue," the Seventh Circuit has "long held that the decision to require exhaustion as a prerequisite to bringing suit is a matter within the sound discretion of the trial court." *Orr v. Assurant Emp. Benefits*, 786 F.3d 596, 601–02 (7th Cir. 2015). Courts generally excuse a plaintiff's failure to exhaust "when resort to administrative remedies would be futile, when the remedy provided is inadequate, or where there is a lack of access to meaningful review procedures." *Id.* at 602 (internal citations omitted). "Ultimately, in exercising its discretion to require or excuse exhaustion, the district court should ask 'whether some useful purpose would be served by requiring' the plaintiff to exhaust the Plan's internal remedies." *Berube v. Rockwell Automation, Inc.*, No. 20 C 1783, 2022 WL 227237, at *2 (E.D. Wis. Jan. 26, 2022) (quoting *In re Household Int'l Tax Reduction Plan*, 441 F.3d 500, 502 (7th Cir. 2006)).

The Court is not persuaded that requiring exhaustion would serve any useful purpose in this case. In the ERISA context, numerous courts have distinguished between plaintiffs who allege that defendants have violated the terms of the plan and plaintiffs who allege that the terms of the plan violate ERISA. Generally, when the parties do not dispute that the plaintiffs have received all of the benefits they are entitled to under the plan as written, the rationale for exhaustion is weakened. *See, e.g.*, *Donaldson v. Pharmacia Pension Plan*, 435 F. Supp. 2d 853, 860 (S.D. Ill. 2006) (explaining that the case was "a poor candidate for exhaustion" because "under the terms of the Plan document, [the plaintiffs] have received all of the benefits to which they are entitled"); *Eaton v. Onan Corp.*, 117 F. Supp. 2d 812, 838–39 (S.D. Ind. 2000) (excusing the plaintiffs' failure to exhaust because they "do not claim that defendants

misapplied or misinterpreted the plan" but instead "contend the plan itself violates the terms of ERISA").

In addition, as the plaintiffs point out, the defendants ultimately updated the actuarial assumptions used in the SLA-to-JSA calculation. When they made that choice, they decided to make the changes *prospective* with an effective date of January 1, 2018. The Court does not draw any conclusions about whether this was a proper course of action. But the point is that the defendants' decision to make only prospective changes to their actuarial assumptions strongly suggests that they would not have granted the plaintiffs' request for retrospective changes to their benefits calculations. The defendants have not provided any reason to think otherwise.

For these reasons, the Court declines to bar the plaintiffs' suit based on their failure to exhaust plan remedies.

## C.   Claims under 29 U.S.C. §§ 1053, 1054, and 1055

Defendants next argue that they are entitled to summary judgment on the plaintiffs' claims under 29 U.S.C. §§ 1055, 1054, and 1053 because those claims are based on the "erroneous legal conclusion" that ERISA requires plans to use the assumptions under 26 U.S.C. § 417(e). The gist of the defendants' argument is that nothing in ERISA prohibits them from using any particular *assumption* so long as the ultimate *conversion factor* is within a reasonable range. They rely on the testimony of their expert, Tom Terry, who opines that, regardless of the use of the outdated mortality table, the SLA-to-JSA conversion factor is within the acceptable range of possibilities that exist using assumptions that a reasonable actuary would use. That is because, according to the defendants, "[a]ctuarially equivalent JSA factors have remained stable

17

over many years, despite changes in mortality, because the factor is calculated as a ratio of present values, with mortality reflected in both the *numerator* and the *denominator*."  Defs.' Mot for Summ. J. at 12.  They cite to a chart in Terry's report that illustrates this point by comparing CITGO's SLA-to-JSA conversion factors with the conversion factors calculated using a variety of different "reasonable" assumptions that a "reasonable actuary" could choose from (represented by hypothetical Plan A, Plan B, Plan C, and Plan D):

**Figure 9:  The Plans' JSA conversion factors sit comfortably within a range of reasonable factors for each named Plaintiff and for illustrative average retirees, where this reasonable range is constructed from my benchmarking assumptions.**[77]

| Name | CITGO Plan | JSA Payment Form | Age of Retiree | Age of Spouse | Actuarial Equivalence Basis | | | | |
|------|------------|------------------|----------------|---------------|------|------|------|------|------|
| | | | | | A | B | Plan | C | D |
| Leslie Urlaub | Salaried | 50% | 59.5 | 57.9 | 0.8713 | 0.8948 | 0.9050 | 0.9048 | 0.9261 |
| Average salaried | Salaried | 50% | 61.6 | 59.5 | 0.8626 | 0.8863 | 0.8936 | 0.8969 | 0.9187 |
| Mark Pellegrini | Hourly | 75% | 62.2 | 60.6 | 0.8061 | 0.8084 | 0.8474 | 0.8506 | 0.8537 |
| Mark Ferry | Hourly | 100% | 66.0 | 63.2 | 0.7253 | 0.7263 | 0.7657 | 0.7802 | 0.7823 |
| Average hourly | Hourly | 50% | 60.4 | 57.7 | 0.8571 | 0.8596 | 0.8968 | 0.8949 | 0.8979 |

[77] I note that low end of the factors' range is produced using the U.S.-wide mortality benchmarking table and a 1.5% interest rate. The upper end of the range is based on the pensioner mortality table and a 5.0% interest rate.

*Id.* at 11.

The problem for the defendants, for summary judgment purposes, is that the plaintiffs' expert, Ian Altman, has expressly opined that Terry's alternative assumptions are *not* reasonable.  *See* Pls.' Stmt. of Material Fact ¶ 33 ("Plaintiffs' expert opines that 'Mr. Terry uses unreasonable inputs to reach his conclusions,' including 'unreasonable interest rate assumptions,' unreasonable mortality assumptions, and unreasonable gender assumptions." (internal citations omitted)).  In addition, Altman opines that "[n]o reasonable actuarial method of which [he is] aware would result in the JSA payment

amounts received by" the plaintiffs. *Id.* ¶ 12. Rather, Altman contends that the plaintiffs' payments were lower than they would have been even if the defendants had used the most "conservative" reasonable conversion rate. *Id.* ¶ 11. Thus, there is clearly a genuine dispute regarding not only whether the defendants' *assumptions* were reasonable, but also whether the defendants' ultimate *conversion factor* was reasonable. The Court cannot credit one expert's opinion over another at the summary judgment stage.

**D.  Breach of fiduciary duty claim**

Finally, the Benefit Plans Committee argues that it is entitled to summary judgment on the plaintiffs' claim for breach of fiduciary duty for several additional reasons. First, the Committee argues that "there is nothing in ERISA that requires plan fiduciaries to deviate from plan terms, even if those terms allegedly violate the Act in some way." Defs.' Mot. for Summ. J. at 14. But that is only partially correct. The Supreme Court has explained that when an ERISA fiduciary's duty—such as the duty of prudence—conflicts with the terms of a plan document, "the duty of prudence trumps the instructions of a plan document." *Fifth Third Bancorp v. Dudenhoeffer*, 573 U.S. 409, 421 (2014). The Supreme Court explained that this order of operations is made "clear" by the fact that 29 U.S.C. 1104(a)(1)(D) states that fiduciaries should act "in accordance with the documents and instruments governing the plan *insofar as such documents and instruments are consistent with the provisions of this subchapter*." *Fifth Third Bancorp*, 573 U.S. at 421.

That being said, the mere fact that a fiduciary carries out a plan with terms that violate ERISA does not *automatically* mean that the fiduciary is liable for breach of

19

fiduciary duty. *See Sec'y of Lab. v. Macy's, Inc.*, No. 17 C 541, 2022 WL 407238, at *9 (S.D. Ohio Feb. 10, 2022) ("The mere fact that § 1104(a)(1)(D) does not 'excuse' a fiduciary from compliance with another provision of ERISA does not mean that § 1104(a)(1)(D) itself *requires* a fiduciary, *as a matter of fiduciary duty*, to disregard plan terms that conflict with ERISA."). In other words, ERISA does not impose a regime of strict liability on fiduciaries for any violation of the statute. The plaintiffs must still carry their burden to prove that the Committee failed to act with the requisite duty of care.

Second, the Committee argues that it did not "misrepresent" that the plaintiffs' JSAs were equivalent to SLAs because the "JSAs are actuarially equivalent to SLAs, and so the Plaintiffs' benefit packets were completely accurate." Defs.' Mot. for Summ. J. at 14 (internal citation omitted). But as the Court has discussed, there is a genuine dispute whether the JSAs were "equivalent" to SLAs in the manner that ERISA requires.

Lastly, the defendants argue that the Committee had no fiduciary duty to "update" the assumptions used by the plan. In support of this argument, they cite to a Supreme Court case stating that the "decision to amend a pension plan concerns the composition or design of the plan itself and does not implicate the employer's fiduciary duties." *Id.* at 15 (quoting *Hughes Aircraft Co. v. Jacobson*, 525 U.S. 432, 444 (1999)). But that case stands for the proposition that an *employer* who chooses to amend a retirement plan that it sponsors is not acting as a fiduciary. *See Hughes Aircraft Co.*, 525 U.S. at 444 ("ERISA's fiduciary duty requirement simply is not implicated where Hughes, acting as the Plan's settlor, makes a decision regarding the form or structure of the Plan such as who is entitled to receive Plan benefits and in what amounts, or how such benefits are calculated."). In this case, the plaintiffs have not brought their

fiduciary-duty claims against the plans' sponsor, CITGO, and thus *Hughes* does not

apply. At any rate, the Court notes that the plaintiffs' fiduciary duty claims do not hinge

on whether the Committee had the authority to amend the plan. For example, the

Committee apparently had the authority to evaluate and make recommendations to

CITGO on the plans' actuarial equivalence definition, and in fact did so successfully in

2016. The plaintiffs also allege, for example, that the Committee violated its fiduciary

duty by not fully disclosing material facts about the value of the JSA option. The

defendants do not argue that *these* functions are outside the authority and scope of the

Committee as fiduciary. They therefore have not shown that they are entitled to

judgment on this claim as a matter of law.

## Conclusion

For the reasons stated above, the Court grants the defendants' motion for

summary judgment with respect to Pellegrini's claim for breach of fiduciary duty (count

4) but otherwise denies the motion [dkt. no. 108].

_____
MATTHEW F. KENNELLY
United States District Judge

Date: May 6, 2024